HELLER DELTAH CO., INC., PERLAS IMPORT CORP., D. LISNER & CO., INC. *v.* UNITED STATES (No. 4648) [1]

[1] C. A. D. 471.

■■■■■■■■

United States Court of Customs and Patent Appeals, November 7, 1951

*John D. Rode* for appellants.

*David N. Edelstein*, Assistant Attorney General (*Joseph F. Donohue* and *Richard F. Weeks*, special attorneys, of counsel), for the United States.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

WORLEY, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the Second Division, Appellate Term, of the United States Customs Court, rendered pursuant to its decision, Reap. Dec. 7819, 24 Cust. Ct. 595, affirming the judgment of the single judge, rendered in conformity with his decision, Reap. Dec. 7689, 22 Cust. Ct. 428, involving Reappraisement 145369-A and thirty-two others which were consolidated for trial. Both tribunals of the Customs Court found the dutiable values of the involved merchandise to be the values returned by the appraiser.

The merchandise consists of imitation pearl bead necklaces of various lengths imported from Spain during the period from December 1936 through April 1938, and invoiced and entered on the basis of export value under section 402 (d) of the Tariff Act of 1930, at various prices in dollars per 100 strings of 40 centimeters length, packed, as follows:

| Quality | Sizes | Date | Price |
|---|---|---|---|
| 292 | 3–7 to 6–12 | Dec. 1936 to July 1937 | $3. 90 |
| 313 | 3–7 to 5–10 | May 1937 to Dec. 1937 | 3. 80 |
| 313 | 6–12 | May 1937 to Dec. 1937 | 6. 00 |
| 313 | 3–7 to 5–10 | Jan. 1938 to Apr. 1938 | 3. 90 |

Section 402 (d) of the Tariff Act of 1930 reads as follows:

SEC. 402. VALUE.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(d) Export Value.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation

to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The local appraiser found the merchandise dutiable on the basis of foreign value, pursuant to subparagraph (c) of section 402, *supra*, which reads as follows:

(c) Foreign Value.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The importers appealed for reappraisement and the single judge, properly observing that a statutory presumption .of correctness attached to the value found by the appraiser, held that foreign value as defined by section 402 (c), *supra*, was the correct dutiable value. The trial judge, after carefully weighing all the evidence, held that appellants had not sustained their burden of proof in that the record on their behalf did not show that there was no foreign value, and made the following findings of fact:

(1) That the merchandise herein consists of imitation pearl beads imported from Spain, qualities 292 and 313.

(2) That such or similar merchandise, known as "crack," was sold in Spain.

(3) That the record fails to establish that there was no foreign value for this merchandise within the definition of section 402 (c), Tariff Act of 1930, and the presumptively correct appraised values have not been overcome.

Upon appeal by the importers, the appellate division of the Customs Court made substantially the same findings of fact in sustaining the judgment of the trial judge.

In our view, both opinions of the tribunals of the Customs Court reflect a careful study and proper weighing of the testimony and other evidence presented.

The evidence offered on behalf of appellants consists of the oral testimony of Sidney Lisner, vice-president of D. Lisner & Co., Inc., and Ernest S. Heller, vice-president of Heller-Deltah Co., Inc., appellants herein and importers of the involved merchandise. In addition, Samuel Bamberger, president of The Perlas Import Corporation (the third appellant herein) testified, and seven exhibits were offered in evidence, one being an affidavit of the manufacturer of the merchandise at bar.

The evidence offered on behalf of the Government consists of the testimony of two witnesses and fourteen exhibits, the majority of which were introduced over the objections of counsel for the importers. Three of those exhibits are certified copies of Treasury Representatives

and are reports of their investigations into the manufacturing and marketing methods of the manufacturer, exporter. Those reports are marked Collective Exhibits 17, 18, and 19, respectively.

Counsel for the importers, in one of the assignments of error to this court, contends that the court below erred "In not finding and holding that Collective Exhibits 17, 18 and 19 were based on hearsay and were not the best evidence and were improperly admitted and considered by the trial court as evidence."

It appears from the testimony in this case that D. Lisner & Co., Inc., and Heller-Deltah Co., Inc., together with the manufacturer Heusch, formed in this country a company known as The Perlas Import Corporation, the third appellant herein. Each party owned an equal interest in the new company with a total investment of $2100.00. In addition to contributing their own share, Lisner and Heller contributed equally one-half of Heusch's share in the undertaking, due to his alleged financial inability to pay his share. An employee of Heller's, Samuel Bamberger, and said to be the American representative of the manufacturer, was put in charge of The Perlas Import Corporation, his duties apparently being to buy and re-sell pearls on Perlas' own account, and also to solicit orders and sell direct for Heusch. His compensation was paid by the Heller-Deltah Company. Prior to the creation of the new company, Heller-Deltah Co. and D. Lisner & Co. were receiving all the pearls exported by the manufacturer. The record also discloses that only the appellants in the instant case purchased pearls at the invoiced prices, and also that others interested in buying pearls in this country were referred to The Perlas Import Corporation by the manufacturer. Appellant Lisner testified that he helped form the new company, which apparently was in competition with his own company, and agreed that Perlas Import should offer pearls at $3.90 per 100 strings, one of the invoiced prices here, which was said to be at a loss, in order to further the interests of the exporter.

An affidavit of Edouard Heusch, manufacturer and exporter of the involved merchandise, appellants' Exhibit 16, sets out that he was the sole manufacturer of imitation pearls in Spain during the period from November 1936 to April 1938; that actual sales for exportation to the United States during said period of qualities 292 and 313 were made only to appellants herein; that said qualities were freely offered for sale to all purchasers in the principal markets of Spain in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States; that no actual sales in the principal markets of Spain for home consumption of said qualities were made during the critical period; that during that period there were no sales for home consumption in Spain or for export to the United States of qualities similar to 292 and 313; and that during the critical period there was no connection, financial or otherwise, between the Industria Espanola

de Perlas Imitation S. A. or The Indra Pearl Co., Ltd., (Heusch's manufacturing and exporting companies, respectively) and D. Lisner & Co., Inc., The Heller-Deltah Co., Inc., or The Perlas Import Corporation.

The Government's Collective Exhibit 17 is a report of Treasury Representative Charles Schlager, under date of January 20, 1940, of an investigation of the importation of imitation pearls by J. H. Meyer in January 1939, the pearls being manufactured by the same manufacturer of the instant merchandise. It is the contention of counsel for the importers that this exhibit was improperly admitted in evidence and is entitled to no weight.

Collective Exhibit 17 states that the manufacturer had a monopoly in Spain for imitation pearl beads; that, as shown by excerpts from letters between the manufacturer and appellants herein, appellants had tried to induce the manufacturer to pretend that sales had been made in the home market at the same prices appellants wanted to establish as the dutiable export value of imitation pearl beads. The report states further that "* * * the same qualities as 313 and 350 [seemingly, quality No. 292 was superseded by quality No. 350] are sold in the home market under the quality name 'crack' and 'check' respectively. The numbers 313 and 350 are simply numbers indicating these qualities ('crack' and 'check') when sold for export to the United States. * * *"

Collective Exhibit 18 is a report of Treasury Representative D. J. DeLagrave under date of June 1938, of an investigation into importations of imitation pearl beads by appellants during the year 1937. One important point brought out in this report refers to the question of whether the involved goods were freely offered to all American purchasers at the same price. We deem it pertinent to quote from that report *in extenso* as follows:

*Relationship:*

Mr. Lisner insists that there is no agreement among the Indra Pearl Co. or the Industria Espanola de Perlas Imitacion and the three concerns who have imported this merchandise to date, that is, D. Lisner & Co., the Heller Deltah Co. and the Perlas Import Co., restricting sales to these three importers. He claims that the only reason sales have not been made directly to other American importers was that the manufacturer was unable to produce enough goods to supply these three customers. Mr. Heusch concurs in this explanation.

However, a careful examination of the correspondence exchanged between the Indra Pearl Co. and the three American importers indicates that an agreement existed from the start to restrict sales to D. Lisner & Co., the Heller Deltah Co. and a sales organization to be owned by these two importers and Mr. Heusch.

The following pertinent extracts from this correspondence are quoted. This correspondence is quoted at some length because of the insistence, especially on the part of D. Lisner, that these pearls are freely offered to all American purchasers at $3.90 per 100 strings.

*Correspondence between Heller Deltah Co., Inc. and Mr. Heusch.*

*Mr. Heusch to Heller Deltah Co.*
*Nov. 10, 1936*

"As I have said, the depreciation of the peseta allows us today to offer you again pearls on the basis of dollars 3.90 net net per 100 strings of 40 cm. and certainly of a quality that would enable you to have success in the United States on this basis.    I would like to know what your intentions are for the future, for recently in Paris I have had the pleasure of seeing Mr. Sidney Lisner and as we have always had the best of business relations, it would be agreeable to me to renew these good relations . . .

"I would even like to revive the 'Perlas Import Co.' and to this I attach great importance . . .

"Mr. Sidney Lisner told me that as soon as he arrived in New York, he would study this question with you, and I would be happy to have your good news on this subject."

*Letter from Heller Deltah Co. to Mr. Heusch*
*Dec. 1, 1936*

"I have had a very pleasant meeting with the Lisner people and have confirmed the arrangement which you made with them, namely, that your entire production of pearls will be taken by D. Lisner and by ourselves, as individuals, and by the Perlas Import Company as an importing agent, this latter Company to be owned by you, Lisner and ourselves, in equal shares, and the function of this Company will be to take import orders for pearls of your manufacture from the various New York jobbers . . ."

\*          \*          \*          \*          \*          \*          \*

*Letter from Mr. Heusch to the Heller Deltah Co. Dec. 12, 1936*

". . . At the same time I learn with pleasure that you look with sympathy upon the business that could be done through the 'Perlas Import Co.', which in reality would have as object to avoid creating for you and for us new competition, and to keep as much as possible the pearl market in your hands, in those of Messrs. D. Lisner & Co. and in ours . . ."

\*          \*          \*          \*          \*          \*          \*

*Letter from Mr. Heusch to D. Lisner & Co. Dec. 26, 1937*

". . . I received these days a letter from Messrs. Heller in which these gentlement [sic] agree with the proposition of the Perlas Import Co. and the exclusivity of our goods as already understood between us. . ."

*Letter from D. Lisner & Co. to Mr. Heusch Feb. 16, 1937*

". . . I hope the production of our orders will not be delayed by any other orders that you may have taken from Heller, who are no doubt the only people with whom you are doing business in America besides ourselves."

\*          \*          \*          \*          \*          \*          \*

Collective Exhibit 19 is a later report of Charles Schlager, Treasury Representative, dated February 7, 1947, supplying additional information concerning the foreign value of imitation pearl beads in Spain during the years 1937 and 1938.    Pertinent sections of this report read as follows:

\*          \*          \*          \*          \*          \*          \*

I hereby certify that the data contained in this report were obtained by personal inspection of the records of the said firm to the extent stated herein:

\*      \*      \*      \*      \*      \*      \*

Mr. Rich (general manager of Heusch's manufacturing company), although frankly admitting that the pearls were shipped for export to the United States at below cost, will give no further explanation other than already given at the time of the previous investigation.

*Home market sales records*

Mr. Rich was very hostile to the investigation and said to quote: "Mr. Heusch reproached me severely after your last visit for talking too much and giving you too much information."

He stated that all records for the period 1938 and 1937 had been destroyed. However, after considerable search, with the assistance of the office manager, the sales records for the years 1938 and 1937 were discovered in a store room.   These records are in the form of typed carbon copies of invoices wrapped in packages marked years 1938 and 1937.   These invoices include a large number of articles such as ear ornaments and other types of pearl beads, irrevelant to this investigation so the copies of these invoices as hereinafter set forth give only the sale in an abbreviated form; i. e. giving only the articles (pearl beads qualities "Check" and "Crack") pertinent to the investigation.   The name of the customer was noted, but not copied and indicated only as sale to a customer at such and such a locality.

I certify that these sales as hereinafter set forth are exact copies of this manufacturer's invoices for all sales that could be located in the records of the aforesaid qualities "Check" and "Crack" for the years 1938 and 1937.   "Check" and "Crack" as freely offered and sold to all customers in the home market without restrictions as to resale or use correspond to quality numbers 350 and 313 respectively as sold for export to the United States.   The prices and specifications have been carefully rechecked against the manufacturer's invoices after copying.

\*      \*      \*      \*      \*      \*      \*

Section 501 of the Tariff Act of 1930, so far as pertinent to the issues in this case provides as follows:

\* \* \* In finding such value affidavits and depositions of persons whose attendance can not reasonably be had, price lists \* \* \*, reports or depositions of consuls, customs agents, collectors, appraisers \* \* \* and other officers of the Government may be admitted in evidence.   Copies of official documents, when certified by an official duly authorized by the Secretary of the Treasury, may be admitted in evidence with the same force and effect as original documents.   The value found by the appraiser shall be presumed to be the value of the merchandise and the burden shall rest upon the party who challenges its correctness to prove otherwise.

It is not within the province of this court to make findings of fact in reappraisement cases.   Our jurisdiction in such cases is limited to a review of the judgments of the United States Customs Court solely on questions of law.   If the record discloses substantial evidence to support the judgment appealed from, it must be affirmed by us.

The credibility of witnesses, the weight to be attached to affidavits, and the reports of government agents and exhibits, is entirely within

the province of the lower tribunals. This is not to say that improper reception by the lower tribunals of evidence is not reviewable here. However, in this case it is our opinion that the evidence objected to by counsel for appellants is properly sanctioned by statute. A careful examination of the record, vital portions of which have been quoted herein, convinces us that there is substantial evidence to sustain the judgment of the Customs Court.

For the reasons herein stated, the judgment of the United States Customs Court is *affirmed*.